**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARK MUSCHKO,

          Plaintiff,

v.

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

Civil Action No. 2:16-cv-00617 (JLL)

**OPINION**

**LINARES**, District Judge.

    Before this Court is Mark Muschko (hereinafter "Plaintiff" or "Claimant")'s appeal, which seeks review of Administrative Law Judge ("ALJ") Marissa Ann Pizzuto's denial of Plaintiff's application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). The Court's jurisdiction to review Plaintiff's appeal falls under 42 U.S.C. § 405(g) and pursuant to Local Civil Rule 9.1(f) the Court resolves this matter on the parties' briefs. The Court has considered the submissions made in support of and in opposition to the instant appeal and decides this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, the Court remands this matter for further proceedings before the ALJ consistent with this Opinion.

I.  **BACKGROUND**[1]

A. **Procedural History**

Plaintiff applied for disability and disability insurance benefits on July 31, 2012 alleging an onset date of December 31, 2007. R. at 13. Plaintiff's claim was denied on November 30, 2012 and then upon reconsideration on March 19, 2013. Id. An administrative hearing was subsequently held before ALJ Pizzuto in Newark, New Jersey on March 17, 2014. Id. at 25. ALJ Pizzuto issued an opinion on July 21, 2014 finding Plaintiff not disabled within the meaning of the Act through the date of last insured, December 31, 2007 and thus denied Plaintiff's claim for DIB. Id. at 18. The Appeals Council denied review of Plaintiff's claim on December 1, 2015. Id. at 1-5. On January 4, 2016, Plaintiff filed the appeal currently pending before this Court. (ECF No. 1, Complaint ("Compl.")).

B. **Factual Background**

1. Plaintiff's Testimony

On March 17, 2014, Plaintiff testified before ALJ Pizzuto. R. at 25-56. At the time of the administrative hearing, Plaintiff was 53-years-old. Id. at 25. Plaintiff testified that on December 31, 2007 at 47- years- old, he became unable to work and that his date of last insured was also December 31, 2007. Id. Plaintiff stated that he worked for AT&T as a lifecycle and product manager until 2002, when he lost his job due to a downsizing at the company. Id. at 28, 38. Plaintiff testified that up to 2005, he searched for other employment before his chronic inflammatory demyelinating polyradiculoneuropathy ("CIDP"), back and neck issues, nonbacterial prostatitis, and side effects from his medication limited his ability to work. Id. at 28.

---

[1] "R." refers to the Administrative Record, which uses continuous pagination and can be found at ECF No. 7.

Plaintiff testified that he has grand mal seizures. Id. at 28. Plaintiff testified that he experienced his first seizure at the age of 15 and that he has since needed to take various medications to treat his condition. Id. Of the medications that Plaintiff has asserted he must take, Dilantin has, over the years, caused him to suffer from osteoporosis and bone fractures in his back. Id. at 30. Plaintiff explained that his seizures usually occur in the morning after a deep sleep. Id. at 28-9.

Plaintiff also testified that he experiences issues with his memory as a result of his seizures coupled with the corresponding medication. Id. at 29. Plaintiff further stated that when "taking [the medication] over a period of time, it [ ] has some issues with memory to a degree." Id. Furthermore, Plaintiff testified that his neurologist attributes these memory-related issues to the seizure medication. Id. As a result of the medication, Plaintiff stated that he often feels "tired, doped up, drowsy and just not sharp or focused." Id. Plaintiff noted that when he asked his doctor about this condition, his doctor explained it is a combination of the medication along with past seizures. Id.

In 2006 and 2007, Plaintiff stated that he suffers from CIDP which Plaintiff described is "an autoimmune disorder that affects the myelin sheath so the myelin sheath gets stripped off and you get a lot of [ ] short circuiting…[This] at first started in the legs where [Plaintiff] get[s] a lot of numbness, tingling and just feels like [he is] walking on sponges and things of that nature…And then it progressed to where [Plaintiff] would get nerve pain and muscle pain in the legs and … in the arms also. It's worse in the legs than it is in the arms, but it's like a numbness tingling nerve pain. [He] gets hot and cold sensations." Id. at 30, 31.

Further, Plaintiff stated that "if [he is] sitting for a period of time things will [ ] stiffen up and they get all tingling and numbness feeling and pain and like sharp pricks you feel in the – as result of the nerves being stripped of that insulation. They're like short circuiting…."

Id. Plaintiff testified that "getting more electricity, more numbness, more tingling, more pricks and [ ] the thing that has [Plaintiff] really scared is [he is] getting nerve pain and muscle pain now in the legs and in the arms which is really – again, [he] had those in the '04, '05." Id. at 31.

Plaintiff explained he underwent a discogram in 1997 and after that his CIDP began slowly to progress throughout the years. Id. at 28. Plaintiff testified he had undergone about 10 immunoglobulin infusions in 2004 and further explained that these infusions did not impact his condition. Id. at 32. To treat his CIDP, Plaintiff stated he tried acupuncture, massage therapy, and physical therapy, but none provided any significant relief. Id. at 37, 41.

Plaintiff further explained that his CIDP is episodic in nature and that there are "certain times it will be significantly worse and other times it will be more of a plateau." Id. at 32. Plaintiff testified that the electrical sensations he experiences in his hands and feet are present at all times. Id. If he touches any part of his body, Plaintiff stated that he experiences sharp electrical impulses. Id. Plaintiff explained "the muscle and nerve pain seem to come on and off in terms of sharp pains, that seem to stop a little but come but the electricity is always there, the numbness and the electricity." Id. at 32-3. He further stated "the electricity and the numbness, that's always there. That's continuous… The muscle pain, sometimes it will go a week, two weeks, other times it might go a bit longer. The muscle pain is more frequent than the nerve stabbing pain." Id. at 33. Plaintiff also highlighted that "the muscle pain [he] gets every week, to weeks it'll flare-up for a while. The sharp spikes and the nerve pain, that all seem to maybe be a month, two months, it varies." Id. Plaintiff further asserted that the described condition has been becoming more frequent. Id. Plaintiff also testified that his constant CIDP was the most notable impediment to maintaining a consistent position of employment. Id. at 34.

Plaintiff also stated that he suffers from spondylosis at the L4-L5, L5-S1. Id. Due to the

4

spondylosis, Plaintiff asserted that his back will go out during times such as taking a shower, bending over or sneezing. Id. Once his back goes out, Plaintiff testified that it takes a week or so before it comes back. Id. Furthermore, Plaintiff stated that he suffers from C6-C7 herniation and therefore as a result of turning his neck it will go out and when he talks his posture is like a "stiff board". Id.

Since he was 20-years-old, Plaintiff testified that he has suffered from prostatitis, which Plaintiff explained causes pain and soreness throughout his pelvic area so when Plaintiff is sitting he experiences "an awful type of discomfort." Id. at 38. Plaintiff testified that this causes him chronic pelvic pain syndrome that has caused him to experience incontinence. Id. at 47. Plaintiff testified that when "conglomerated together it makes things very, very, very challenging to move forward and try to do anything because the last thing [he] would want to do is not work. [He has] worked for the past 20 years." Id. at 38.

Plaintiff also testified that sitting is very challenging because whenever he sits his back begins to tighten up. Id. at 39. Plaintiff testified that due to the CIDP, "if [he] sit[s] for a half hour, forty-five minutes [his] legs will go to sleep ... and his nerves ... get very, very painful and in the thigh and in the calf area is where it starts to really ramp up and really hurt." Id. Also, Plaintiff stated that he has a torn cartilage in his left knee that "needs to get some surgery." Id. at 40. Plaintiff testified that he is seeing an orthopedist for his wrist and tendonitis in his left elbow. Id.

Plaintiff testified that he takes the following medications, Trileptal for seizures and Mobic, which is an anti-inflammatory for inflammation of the back and neck, Lyrica and/or

Cymbalta for the nerve pain. Id. However, Plaintiff noted that both Lyrica and/or Cymbalta in combination with the Trileptal gets him "so doped up and tired that [he] just can't function properly." Id. at 42. Specifically, Plaintiff testified:

> "So I try to just keep the seizure medication as the main medication that I take, along with—I'll take some vitamins, as well as the Mobic. Sometimes I'll take the Aleve because I don't like taking too much Mobic too, but it just – if I take too much medication it just makes you very unsharp, very unfocused and you can't concentrate.
>
> The Tripleptal does that enough by itself, but in concert with Lyrica and the Cymbalta, because they tried that for a period of time – that's supposed to try to make that tingling sensation subside somewhat."

Id. at 42-3. Plaintiff explained that he takes Lyrica every couple of months and that Cymbalta is more of an anti-depressant so he tries to only take the Lyrica. Id. at 43. Plaintiff stated that when he does take Lyrica, he will take it for about a month or so until his condition subsides. Id. at 46.

### 2. Medical Evidence of Record[2]

Medical records from the Neurology Office at Cornell University dated July 9, 1997 through March 19, 2004 show that Dr. Norman Latov, M.D., Ph.D examined Plaintiff throughout this period. Id. at 204 – 11. The Plaintiff's July 9, 1997 visit reveals that he was being prescribed the following medications: Dilantin 400 mg qd, Fosamax 10 mg qd, and Caltrate 600 mg. The medical record from this visit further provides that an electromyogram ("EMG") and nerve conduction studies of Plaintiff's legs indicated the presence of a mild neuropathy. Id. at 210. On examination, Dr. Latov noted that Plaintiff's "skin was clear and there was no lymphadenopathy or thyromegaly, and no skeletal deformities. Heart and lungs were normal. Abdomen was soft with no organomegaly. Mental status and cranial nerve functions were normal." Id. at 210 – 11. Dr. Latov explained that Plaintiff could have peripheral

---

[2] The Court notes that it is not necessary to review the evidence in the record after December 31, 2007 since the Court writes for the parties who are familiar with the facts of the case and the ALJ's decision's asserts that Plaintiff "must establish that his impairments were disabling on or before this date." R. at 16.

neuropathy or myelopathy and that "the symptoms began shortly after the discogram, and it is unlikely that they are due to Dilantin neuropathy. Arachnoiditis or reflex sympathietic [sic] dystrophy should be considered. The following studies are suggested: 1) EMG and nerve conductions studies of the upper as well as the lower extremities to determine whether he has a generalized neuropathy; 2) Spinal somatosensory evoked ANA, complement, hepatitis B and C serology, immunofixation electrophoresis, Lyme serology, rheumatoid factor, RPR, ACE and antibodies to sulfatide, and MAG." Id. at 211. Dr. Latov instructed Plaintiff to return for follow-up in one month. Id.

Plaintiff's follow-up visit on August 13, 1997 provided the following results: the Spinal somatosensory evoked responses that were consistent with sensory neuropathy in the legs, the EMG and nerve conduction studies revealed peripheral neuropathy in the legs, MRIs of the cervical thoracic and lumbar spines were unremarkable, blood tests showed a glucose of 58 (nl. 70-105), white blood count 4.2 (nl. 4.5 -11) with normal electrolytes, renal function and liver function. Id. at 209. It further appeared that Plaintiff had peripheral neuropathy in the legs, however at that point, Dr. Latov opined that the cause was unknown and further suggested that the Plaintiff undergo a glucose tolerance test in order to determine if Plaintiff has diabetes mellitus. Id.

On June 23, 2003, at the subsequent follow-up visit with Dr. Latov, the records reveal that Plaintiff's neuropathic symptoms had "gradually increased, with more electric-like and vibrating pains in his feet, and occasionally at the tips of his fingers." Id. at 208. Furthermore, the most recent EMG/NC studies at that point provided that Plaintiff peripheral neuropathy with slowed conduction velocities. Id. Furthermore, this record indicates that Plaintiff had a history of seizures and osteoporosis. Id. The examination on June 23, 2003 revealed that Plaintiff's

strength was normal and that he was able to rise on his heels and his toes, get up from a chair using his arms, and also that he was able to get up from a kneeling position with either leg. Id. Plaintiff's sensory examination provided that vibration is moderately impaired at the large toes, mildly impaired at the ankles. At this point, it is further noted by Dr. Latov that the neuropathy had slightly progressed and he ordered the following tests to be performed: immunofixation electrophoresis, anti-MAG, sulfatide, GDlb and GQlb antibodies, and gliadin and transglutaminase antibodies. On July 28, 2003, Dr. Latov's records reveal that Plaintiff's symptoms were "more severe" and also that Plaintiff's condition is most consistent with the diagnosis of CIDP, which is active and progressive. Id. at 207. To treat aforesaid condition, Dr. Latov recommended that Plaintiff undergo a "trial therapy with IVIg, 40 g/day x 4 days over 2 weeks, and then 40g q 2 weeks x 3 months, at which time Dr. Latov said Plaintiff would be re- evaluated." Id.

Thereafter on November 21, 2003, Dr. Latov diagnosed Plaintiff with CIDP and indicated that after the fourth trial treatment, Plaintiff developed a headache and fever, which lasted for several days. Id. at 206. The record shows that Plaintiff stated that he wanted to continue treatments despite the chance that he may experience another reaction. Id. Further, at this appointment, Dr. Latov stated that Plaintiff's neuropathy symptoms and examination were unchanged. Id.

As the record herein indicates, Plaintiff returned on February 26, 2004 for a follow-up with Dr. Latov. Id. at 205. However, Dr. Latov at that time opined that Plaintiff's neuropathy appeared to be stable. Id. On March 19, 2004, Dr. Latov examined the Plaintiff again during a follow-up visit. Id. at 204. At this visit, Dr. Latov recorded that he still suffered from CIDP; it was further noted that the Plaintiff had developed vibratory sensations in his legs. Id. EMG/nerve conduction studies performed at the visit did not indicate any change from the

studies previously performed in July 2003. Id. The medical record from this visit also reveals that Plaintiff was taking 1200 milligrams of Trileptal per day for his seizure disorder. Id.

Records from Dr. Hajjar, dated August 17, 2002, December 30, 2003, and January 18, 2003, indicate that Plaintiff has a history of chronic prostatitis. Id. at 235-7. Plaintiff's August 17, 2002 record from Dr. Hajjar, during which the Plaintiff was also diagnosed with benign prostatic hyperplasia ("BPH") and chronic prostatitis, states that Dr. Hajjar directed the Plaintiff to take Flomax for a period of four weeks. Id. at 237. After the completion of this medication, Dr. Hajjar instructed the Plaintiff to return to his office from a follow-up examination. Id. At this visit, it was also recorded that Plaintiff experienced "perineal discomfort with difficult sitting for a prolonged period of time, consistent with recurrent symptoms of prostatitis. Id. Plaintiff's physical examination also revealed a tender prostate consistent with chronic prostatitis. Id. On November 24, 2008, Plaintiff returned to Dr. Hajjar for a follow-up. Id. at 225. The records from this visit indicate that Plaintiff suffered from left testicular orchialgia. Id.

## II.     STANDARD OF REVIEW

This court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and "[i]t is less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). The "substantial evidence standard is a deferential standard of review." *Id.* The ALJ is required to "set forth the reasons for his decision" and not merely make conclusory unexplained findings. *Burnett v. Comm'r of Soc. Sec,* 220 F.3d 112, 119 (3d Cir. 2000). But, if the ALJ's decision is adequately explained

and supported, the Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986)). Finally, the Third Circuit has made clear that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his [or her] analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505.

## III. THE FIVE STEP EVALUATION PROCESS TO DETERMINE DISABILITY UNDER THE ACT

The Social Security Act authorizes the Administration to pay a period of disability, disability insurance benefits and supplemental security income to disabled individuals. 42 U.S.C. §§ 423 (a); 1382. Pursuant to the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairment(s) are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Regulation promulgated under the Act sets forth a five-step process to be used by the ALJ to determine whether or not the claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). The claimant bears the burden of proof at steps one

through four whereas the Administration bears the burden at step five. *Poulos v. Comm'r of Soc. Sec.*, 474 F. 3d 88, 92 (3d Cir. 2007) (citing *Ramirez v. Barnhart*, 372 F. 3d 546, 550 (3d Cir. 2004)). The first step in the sequential evaluation process requires that the ALJ determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a). If it is found that the claimant is engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Alternatively, if it is found that the claimant is not engaged in substantial gainful activity the evaluation proceeds to step two. *Id.* At step two, the ALJ must determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits. However, if the ALJ finds that the showing indicates claimant's disability is severe, the analysis proceeds to step three. At step three, the ALJ then evaluates whether the claimant's severe impairment is listed or is equivalent to an impairment set forth by the Code. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four.

Step four requires that the ALJ make specific findings of fact as to the claimant's residual functional capacity and also as to the mental and physical demands of the claimants past relevant work. After both of these findings are made, the ALJ must compare the RFC to the past relevant work to determine whether Claimant retains the RFC to perform the past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994). If at step four, the evaluation indicates that the claimant is unable to resume past relevant work or any employment history does not qualify as past relevant work, the evaluation moves to step five. *Jones*, 364 F.3d at 503. The final step shifts the burden of proof to the "Administration to show that the claimant

is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience and [RFC]." *Ramirez*, 372 F.3d at 551; 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *Jones*, 364 F.3d at 503.

Additionally, under the Act, disability must be established by objective medical evidence. To this end, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." 42 U.S.C. § 423(d)(5)(A). Instead, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

*Id.*; *see* 42 U.S.C. § 1382c(a)(3)(A). Factors to consider in determining how to weigh evidence from medical sources include: (1) the examining relationship; (2) the treatment relationship, including the length, frequency, nature, and extent of the treatment; (3) the supportability of the opinion; (4) its consistency with the record as a whole; and (5) the specialization of the individual giving the opinion. 20 C.F.R. § 404.1527(c).

## IV.  DISCUSSION

In applying the sequential evaluation process explained above, the ALJ in the case at bar concluded that the Plaintiff was not disabled as defined by the Act. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged date of onset, December 31, 2007. R. at 15. At step two, ALJ Pizzuto found that under 20 CFR § 404.1571 *et.*

*seq*. Plaintiff indeed suffered from the following medically determinable impairments: chronic demyelinating inflammatory polyneuritis and seizure disorder. Id. The ALJ found at step three that "through the date of last insured, the claimant did not have an impairment or combination of impairments that significantly limited [his] ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments." Id; 20 CFR 404.1521 *et. seq*. After the determination at step three, the ALJ did not proceed to the following steps in the evaluation process.

### A. The ALJ's Finding that Plaintiff's Impairments are Not Severe is Not Supported by Substantial Evidence

Plaintiff argues that the ALJ improperly evaluated the medical evidence and therefore improperly rendered Plaintiff's impairments of CDIP and seizure disorder as not severe. Pl.'s Br. 12. This Court agrees that the ALJ did not base her findings on substantial evidence and therefore remands the matter on this issue for further analysis in accordance with this Opinion.

In support of his argument, Plaintiff asserts that the ALJ "fail[ed] to acknowledge the medical evidence of prior to the date of last insured, i.e. December 31, 2007" and that the ALJ "failed to mention let alone consider all of the medical evidence in the record." Id. 15, 16. Specifically, Plaintiff contends that the ALJ failed to discuss "Dr. Latov's medical records from July 9, 1997 to March 19, 2004, Dr. Hajjar's medical records dating back to August 17, 2002 and Dr. Lampariello's medical records dating back to March 24, 2006." Id. Plaintiff also contends that ALJ Pizzuto failed to correctly analyze Plaintiff's impairments under the "slight abnormality" standard as required by 20 CFR § 404.1521 and as a result, argues that the ALJ's finding that Plaintiff's CIDP and seizure disorder are not severe is not supported by the evidence of the record. Id. 14. Lastly, Plaintiff asserts that the ALJ failed to reconcile the discrepancy in the findings of the State agency non-examining physicians and the ALJ's determination rendering Plaintiff's impairments as not severe as required by SSR 96-6p. Id. 14. Plaintiff

specifically purports that the ALJ "provided no rationale for the conflict" presented by the opinion of the State agency non-examining physicians and the ALJ's determination that Plaintiff's impairments were not severe. Id.

In turn, Defendant argues that Plaintiff's argument is meritless and that Plaintiff "falsely claims that the ALJ's opinion contradicted the State agency's physicians". Def.'s Br. 8. The Defendant claims that "a claimant's statements about his impairments, alone, are never enough to prove disability" and that "subjective complaints at the very least should be corroborated by the objective medical evidence of record." 20 C.F.R. § 404.1529(a).

When a claimant asserts subjective complaints, in order to establish disability, a physical or mental impairment must be present and demonstrated through "medically acceptable clinical and laboratory diagnostic techniques, which could reasonably be expected to produce the symptoms alleged." *Accomando v. Comm'r of Soc. Sec.*, No. 13-1391, U.S. Dist. LEXIS 160909, at *20 (D.N.J. Nov. 14, 2014)(citing 20 C.F.R. §§ 404.1529(b) and 416.929(b); accord *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992); *Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984)). In light of the medical evidence in the record, it is within the discretion of the ALJ to render a determination as to the credibility of the plaintiff however the issue then becomes whether the ALJ's determination is supported by the record as a whole. *Id.* (citing 20 C.F.R. §§ 404.1529, 416.929.). Furthermore, a remand is appropriate when it is impossible to determine whether the ALJ's findings are supported by substantial evidence due to the ALJ's failure "to evaluate adequately all relevant evidence and to explain the basis of [the] conclusions" and "to explain [the] assessment of the credibility of, and weight given to, the medical evidence and opinions from [] treating physicians. " *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001).

Here, the ALJ's decision emphasized that Plaintiff must establish his impairments were severe prior to December 31, 2007 by providing medical evidence preceding this date. R. at 16.

However, the record herein clearly reflects medical evidence prior to December 31, 2007, and the ALJ's decision fails to mention these records or provide any analysis pertaining thereto, and instead concludes that "based on a review of the scant medical evidence in record, and taking into account the claimant's subjective allegations, the undersigned find [sic] that the claimant's impairments before his date of last insured were non-severe in nature." Id. at 17. Here, although the ALJ acknowledges that the record contains evidence prior to this date, fails to give any reasoning for neglecting to include this evidence in her analysis. ALJ Pizzuto stated "a review of the medical record indicated that the majority of evidence the claimant has proffered post-dates this period and therefore is not relevant for purposes of this present disposition." Id. However, the ALJ then nevertheless proceeded to assess medical records from 2008, 2009, and 2012, notwithstanding her prior assertion that medical records after December 31, 2007 are not relevant to the determination. Id. The record includes medical evidence from Plaintiff's treating physicians' assessments prior to December 31, 2007 from both Dr. Latov and Dr. Hajjar. See Id. at 203-219, 220-238. Thus, the record does in fact reflect evidence dated prior to December 31, 2007 which the ALJ's decision failed to mention or consider therefore absent this analysis this Court cannot determine whether the ALJ's determination that Plaintiff's impairments are not severe is supported by substantial evidence and the matter must be remanded.

Though Defendant correctly asserts the State Consultative exam sets forth that the "evidence is sketchy and incomplete," the analysis concludes that the Plaintiff has one or more medically determinable impairments and diagnoses. The Plaintiff's impairments of "disorders of muscle,

ligament and fascia" as severe. R. at 60, 61. As it is well established "a District Court has no fact-finding role in reviewing social security disability cases," "when the ALJ does not address all of the evidence of record, the appropriate action is to remand for further proceedings." *Zied v. Astrue*, 347 F. App'x 862, 865 (3d Cir. 2009). After thoroughly reviewing the Administrative Record, the Court finds that the ALJ did not provide an appropriate analysis of the overall evidence. Accordingly, the Court remands this matter for further analysis based on the medical evidence in the record for the relevant time period consistent with this Opinion.

### B. The ALJ Fully Developed the Record and Adequately Questioned the Plaintiff

Plaintiff argues that ALJ Pizzuto also failed to fully develop the record by failing to fully question the Plaintiff and that on this point alone, the matter should me remanded for further development of the record. Pl.'s Br. 16. The Court does not agree.

Plaintiff contends that the ALJ failed to develop the record because she did not question the Plaintiff about his orthopedic injuries or order a consultative exam, and consequently "found incorrectly that Plaintiff's impairments were not severe, contrary to the findings of the State Agency physicians." Id. 17. And, further argues that "due to the 'non-adversarial nature,' the ALJ has a duty to develop the record and conduct a complete review of it before determining the eligibility for benefits." Id. In turn, the Defendant asserts that the Plaintiff's representative affirmed that the hearing was complete at the conclusion of the testimony and that the ALJ "thoroughly questioned the Plaintiff about all of his impairments, symptoms and treatment." Def.'s Br. 7. The Court finds here that ALJ Pizzuto adequately questioned the Plaintiff to fully develop the record.

An ALJ's hypothetical question need not include "every impairment *alleged* by a claimant," but only those that are "medically established." *Rutherford v. Barnhart,* 399 F.3d 546,

16

554 (3d. Cir. 2005) (emphasis in original). This Court finds that ALJ Pizzuto sufficiently developed the Administrative Record by thoroughly questioning Plaintiff about his medically established impairments of CIDP, seizure condition, nonbacterial prostatitis, torn cartilage in his left knee, and symptoms resulting from his medications. *See generally* R. at 25-45, 48-55.

## V.   CONCLUSION

The Court has reviewed the entire record and for the foregoing reasons concludes that ALJ Pizzuto's decision that the Plaintiff is not disabled within the meaning of the Act is not supported by substantial evidence based on a proper analysis of the medical record. Accordingly, ALJ Pizzuto's decision is remanded for further analysis consistent with this Opinion. An appropriate Order follows.

DATED: January ___4th___, 2017

JOSE L. LINARES
UNITED STATES DISTRICT JUDGE